AARON L. CRENSHAW, JAMES PORTER, JAMES L. BARRON, AND JOSE D. SENA, SHERIFF OF THE COUNTY OF SANTA FE, *v.* SIMON DELGADO, ADMINISTRATOR OF THE ESTATE OF OLIVER P. HOVEY, DECEASED.

JUDGMENT AS A LIEN, NO STATUTE RELATING TO.—The statutes of New Mexico are silent as to the effect of a judgment as a lien, and as to the manner of distributing the assets of insolvent estates among the creditors, and the courts are compelled to resort to the civil laws of Spain and Mexico for a rule to guide them in determining the priorities among creditors in such cases.

JUDGMENT CREDITOR OF DECEASED INSOLVENT. —A creditor who has recovered judgment against his debtor in his life-time, but has not sued out execution, upon reviving such judgment by *scire facias* against

the administrators of the debtor after his death, has no priority over other creditors where the estate is insolvent, and is entitled only to payment *pro rata* with other creditors having no legal preference.

INJUNCTION LIES TO RESTRAIN EXECUTION IN SUCH CASE.—Such creditor may be enjoined from enforcing his judgment beyond the *pro rata* share to which he may be entitled.

APPEAL from the district court for Santa Fe county. The case appears from the opinion.

*Charles P. Clever*, for the appellants.

*R. H. Tompkins*, for the appellee.

By Court, BENEDICT, C. J.:

This was a bill in chancery for an injunction. It appears that Crenshaw, Porter, and Barron, in August, 1861, and in the life-time of Hovey, recovered in the district court a judgment against him for the sum of one thousand four hundred and one dollars and fifty cents, but that no execution to enforce its collection issued up to the time of Hovey's death in August, 1862. At the August term, 1864, by proceeding of *scire facias* they obtained a judgment of revival against Simon Delgado and John Gwyn, Jr., administrators of Hovey's estate, with an order for execution against them as such, in the due course of administration, to be levied of the goods, and chattels, and effects of the deceased Hovey in their hands to be administered. The bill shows the execution issued and was placed in the hands of sheriff Sena to execute, with instructions to levy the same to the exclusion of other creditors of the said estate, and that the sheriff was threatening to levy upon the goods and chattels of the deceased in the hands of the administrators in order to make the money due upon the said judgment.

It further showed that Hovey's estate was largely insolvent, and could not pay more than some thirty or forty cents upon the dollar, of the indebtedness to creditors. An injunction was prayed to restrain Crenshaw, Porter, and Barron, and the sheriff from levying the execution in pursuance of the instructions of the three first named, and the threats of the sheriff. In the district court the appellants

filed a demurrer to the bill, which was overruled by the court, and they refusing to answer or proceed further in defense, the court decreed a perpetual injunction, strictly enjoining and restraining the appellants from proceeding to collect the execution beyond what should be proportional to Crenshaw, Porter, and Barron among other creditors of the insolvent estate of Hovey, deceased, but that the injunction should not extend to such proportional part. From this decree, Crenshaw, Porter, and Barron appealed to this court. After the judgment in the case by *scire facias*, Gwyn resigned his position and duties as an administrator, and the bill was filed by Delgado as sole administrator.

The errors assigned upon the record are the overruling of the demurrer and the decree of perpetual injunction. The principal inquiry in this case is, were Crenshaw, Porter, and Barron, as judgment creditors, entitled to their full pay out of the insolvent estate of Hovey? The demurrer admits the insolvency as stated in the bill. The court can not fail to regret that during about fifteen years of territorial legislation, the assembly of New Mexico has omitted to pass acts fully defining and establishing what liens result upon property upon the rendition of judgments, and the manner of distributing among creditors the assets of the insolvent estates of deceased persons. In the absence of such legislation the courts are often troubled with great anxiety in the search to find some rule or law among the civil laws of Spain and Mexico, to aid or guide them in their decisions.

In this case Crenshaw & Co. contend that their debt is of such nature and dignity in law, that they are entitled to levy and coerce by execution the full payment of their judgment, in defiance of, and to the exclusion of all other creditors, be their claims of whatever nature they may, and the condition they occupy towards the estate. The administrator contends that as the estate is insolvent, the creditors in this case are entitled to no more than a share *pro rata* among other creditors.

To determine this controversy, it is proper to refer to the Spanish and Mexican civil law as it existed at the time New

Mexico became a portion of the United States. To ascertain what the law was, very high authorities are provided for consultation to aid us in the investigation, such as Escriche, Sala, Asso, Manuel, Tapia, Domat, Febrero, the Partidas, and Nuevo Recopilacion, with Schmidt's Civil Law of Spain and Mexico. Domat distinguishes three classes of creditors, and two sorts of privileges: "Those who have neither mortgage nor privilege; those whose credit has some privilege that distinguishes their condition from that of other creditors, and which gives them a preference to those whose credit is prior to theirs."

One privilege is that which is "given the creditors on all the goods without any particular privilege on any one thing." The other, "which assigns to the creditors their security as certain, and not on the other goods." "The privilege of a creditor is the distinguishing right which the nature of his credit gives him, and which entitles him to be preferred before other creditors." Among creditors who are privileged, some of them are preferred before others, according to the nature of their privileges, and the disposition of the laws and customs. Thus he who has furnished money to repair a house, which was in danger of falling, is preferred to the seller of that house, who demands the price of the sale. This at law, being the debt of all the parties, they are preferred to all privileges whatever. Thus funeral charges are preferred before the rent due to the landlord of the house on the movables of the tenants. Thus those who have privileges on movables, are preferred to the privilege of the king. Thus in all the cases of a concurrence of privileges their preference is regulated by the distinctions which the nature of the said privileges makes. "It follows that among creditors there are three orders; the first is of those that are privileged who go before all the others, and take place among themselves according to the distinctions of their preferences." The second is of those who have mortgages, who have their rank after the privileged creditors according to the dates of their mortgages; and the third is of creditors by writing, and others who have only personal actions, who, not being distinguished either by privilege or

mortgage, come in, therefore, jointly together, and share equally in proportion to their debts.

Schmidt's Civil Law is regarded as a treatise prepared with great care and accuracy from the various authorities and authors before mentioned. He divides the creditors of an insolvent estate into five classes. In the fifth and last are placed "ordinary creditors," such as those by "public act," those whose debts are evidenced by acts under private signature, written on "properly stamped paper," "and those who justify their claims by witnesses when the obligation is on common paper." It is manifest that the Spanish and Mexican laws attached great importance to solemn acts of parties when evidenced by writing on stamped paper. Such paper was one of the sources from which the governments drew their revenues. The stamped paper gave no intrinsic merit to the person using it, but was prescribed among the public policies to maintain the public credit and officers. Our general government has now established the like policy, which did not exist with us when New Mexico became a portion of the United States. The courts of this country did not regard as binding upon them the Mexican stamp laws.

Much stress has been placed by complainant's counsel upon section 1, p. 32, of the Revised Statutes. It was promulgated September 22, 1846, by General Kearny, then commanding here, after the conquest of the country from Mexico. The same section was adopted by a general legislative enactment after the organization of the territory (by authority of congress), as defined in the organic act. It says: "The laws heretofore in force concerning descents, distributions, wills, and testaments, as contained in the treatises on those subjects written by Pedro Murillo de Loarde (Larde) shall remain in force so far as they are in conformity with the constitution of the United States and the state laws in force for the time being."

Now, as to the stamp duties upon legal instruments, it is seen the constitution, as a supreme law, required none, and there does not seem anything in the state laws, which, by the local law of New Mexico, stamped paper became essen-

tial, nor any of the consequences of the Mexican law remained in force, whether the written instrument was stamped or not.

As regards "public acts," they doubtless were such as documents "under private signature, signed by the debtors and three witnesses," with the latter's acknowledgment of their signatures in court, or a judicial acknowledgment by the debtor of the existence of the debt. The Partidas assert the rule, that when there exist conflicts between ordinary creditors whose debts are written on unstamped paper, or proved by witnesses or confession of the debtor, priority of time does not give preference, and all must be paid *pro rata.* The language in the section from the Kearny code, "the state laws in force for the time being," must be taken to have some signification. In doubtful cases, and where the equity is strongly marked, the rules of distribution enacted by states as state laws may properly be considered as high authority in the absence of direct and positive territorial legislation. The sentence quoted seems intended to refer the courts to sources not emanating from the civil law. By such reference we think it will be found that the privilege which the appellants seek to enforce, to the exclusion of all other creditors, has but slender support. We are of opinion that the general rule will be found in harmony with that asserted in Las Partidas and Domat as to distributions *pro rata.*

The complainants contend that by their judgment in Hovey's life-time, they obtained a lien upon all his property for its satisfaction. As to the effect of the judgment as a lien, our statutes are silent. When executive process or execution was taken from the judicial tribunal (as we learn from the Nuevo Recopilacion), and placed in the hands of the executive officer, it was his duty to indorse upon the process the time at which it came to his hands. This would seem to indicate that it should operate as a lien from that time, and against other creditors.

The complainants in this case, by their proceedings, show they regarded themselves as having no lien by virtue of their judgment, as against other creditors, for they went

into court to revive it. By reason of their laches while
Hovey was living, they neither levied upon his property nor
took out an execution. The court, in reviving their judg-
ment, adjudged it should be paid in "due course of admin-
istration." This was correct. While the amount was not
impaired, the court took notice that the positive law of the
land had intervened upon the consequences which followed
the death of the debtor. His personal property and credits
had passed to administrators as trustees for all the credit-
ors. His real estate had vested in his heirs, subject to the
liens of creditors in the due course of administration. Be-
yond all dispute, there were some classes of debts, such as
funeral expenses and those of the last illness, with several
others, which were privileged before all others, and no
priority of ordinary debts would defeat them.

The district court was not so blind to its duties, as to
adjudge to the complainant a full and absolute sweep in
their favor upon all the means of Hovey's estate, in defiance
of the administration the law was making; yet in the at-
tempts made by them by the execution which has been en-
joined, they sought to accomplish what the district court
gave them no authority to do. This court recognizes that
the probate court is the tribunal where is specially vested
jurisdiction over the estates of deceased persons. Admin-
istrators are subject to its supervision. It has the power to
apportion the assets of estates for distribution, subject to
appeals to the district courts. For this purpose, it examines
all debts and claims of whatever dignity or privilege.
While the district and supreme courts will restrain the
probate courts from attempts to transcend the legitimate
bounds of their jurisdiction, the former will be equally care-
ful to preserve to the probate courts the powers, duties, and
jurisdiction with which they are vested by the organic act.

It is the opinion of this court that the demurrer was
properly overruled in the court below, and that the per-
petual injunction was correctly decreed, and that the decree
of affirmation in this court is justly rendered.